**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| IONICA PLC, | : | Case No. 98 B _____ (___) |
| Debtor. | : | |

------------------------------------------------------------x

## AFFIDAVIT OF GARETH HOWARD HUGHES
## PURSUANT TO LOCAL RULE 1007

GARETH HOWARD HUGHES, being duly sworn, deposes and says:

1. I am one of three joint administrators (each a "Joint Administrator") appointed by the High Court of England and Wales pursuant to the terms of an order of the court for the administration (the "Administration Order") of Ionica plc, the above-captioned debtor and debtor in possession ("Ionica" or the "Debtor") under the provisions of Part II of the Insolvency Act 1986 (the "Insolvency Act"). A copy of the Administration Order is annexed hereto as Exhibit "1" hereto.

2. I submit this affidavit in accordance with Local Rule 1007 of the United States Bankruptcy Court for the Southern District of New York on Ionica's behalf in conjunction with its voluntary chapter 11 petition dated December 11, 1998 (the "Petition"). Unless otherwise indicated, all financial information contained herein is presented on an estimated and unaudited basis. Such financial information was presented by Ionica to the High Court of England and Wales on October 29, 1998. The information in this affidavit regarding the background of Ionica and its current financial status is known to me by virtue of the affidavit of Mr. Michael Biden, Chief Executive Officer of Ionica, who submitted his affidavit with Ionica's petition to the High Court for the purpose of obtaining the Administration Order. This affidavit has been prepared using information extracted from the relevant paragraphs from Mr Michael Biden's

affidavit to assist this Court and has been prepared by me, relying on the accuracy of that information. Some further information in this affidavit has been obtained by me as a result of my initial investigation into Ionica's business and affairs, since my appointment as a Joint Administrator on October 29, 1998, and certain information set out in the Exhibits has been provided by the PWC Administrators[1]. Where facts and matters to which I depose are not within my own knowledge, they are true to the best of my knowledge and belief. We reserve the right to amend each and every exhibit to the petition if further information is forthcoming.

## I. INTRODUCTION

A.  General Information

   3.   No case under the former Bankruptcy Act or the Bankruptcy Code commenced by or against Ionica is now pending. Ionica's case was not originally pending under chapter 7 of the Bankruptcy Code.

   4.   Except as discussed below, no committee, to my knowledge, has been organized, prior to the commencement of this chapter 11 case, to represent Ionica's unsecured creditors or equity holders. An informal committee of holders (the "Noteholders") of the 15% Senior Discount Notes due 2007 and 13 1/2% Senior Notes Due 2006 was established in or around August 1998 for the purposes of considering a proposed restructuring of the Debtor. This committee originally consisted of Alliance Capital, Franklin Mutual Advisors, Inc., ING Barings (U.S.) Capital Corp. ("ING Barings"), Paribas and Moore Capital. The original informal committee was represented by Cadwalader, Wickersham & Taft. The constitution of this informal committee changed immediately preceding the filing of the Petition. The committee is now comprised of the following institutions: Credit Suisse First Boston, ING Barings, Paribas, and

---

[1] Pursuant to the Administration Order, the High Court appointed Neville Kahn and Christopher Hughes from PricewaterhouseCoopers (the "PWC Administrators") and myself, for Ernst & Young (the "E&Y Administrator") as the Joint Administrators.

Parabola. Each member of the current informal committee of the Noteholders has formally expressed its consent to the filing of the Petition before this Court and certain Noteholders have agreed to fund the expenses of Ionica's chapter 11 case, including but not limited to the fees and expenses of counsel retained by the Debtor. A complete list of the members of the current informal committee is annexed as Exhibit "C" to the petition and incorporated herein by reference.

      5.     A list of the names, addresses, names of persons familiar with Ionica's accounts, the estimated amount of each claim, and an indication of whether such claim is contingent, unliquidated, disputed or partially secured, of Ionica's twenty largest unsecured creditors is annexed as Exhibit "D" to the Petition and incorporated herein. This information is an estimate only, based on information available to the Joint Administrators immediately following their appointment.

      6.     A schedule of Ionica's secured creditors is annexed as Exhibit "E" to the Petition and incorporated herein.

      7.     A list of Ionica's assets and liabilities is annexed as Exhibit "F" to the Petition and incorporated herein. This information has been extracted from the Statement of Affairs of the Debtor filed with the High Court of England and Wales on October 29, 1998.

      8.     Ionica's common stock is not registered under Section 12 of the Securities and Exchange Act of 1934 and is not traded on the London Stock Exchange. Ionica's 15% Senior Discount Notes due 2007 and 13 1/2% Senior Notes Due 2006 are publicly held. A summary of Ionica's publicly held securities and the officers and directors who hold such securities is annexed as Exhibit "G" to the Petition and incorporated herein. To my knowledge, both the Senior Discount Notes and the Senior Notes are listed on the London Stock Exchange and NASDAQ, although I understand trading has been suspended.

      9.     A summary of all of Ionica's assets in the hands of third parties and custodians, public officers, mortgagee, assignee of rents and secured creditors is annexed as Exhibit "H" to the Petition and incorporated herein.

10. The premises owned, under lease, or held under any other arrangement from which Ionica operates it business, including base and switch station sites are all located in England. A list of these premises is annexed as Exhibit "I" to the Petition and incorporated herein. The approximate value of such sites is noted in the Statement of Affairs of the Debtor at a book value (including stock) of £187,290,000 (approximately US$309,041,700) However, the anticipated realizations are much lower than such book values.

11. Ionica's substantial assets (including those subject to security) are located in New York and England. Ionica's books and records are located in England. A complete list of the location of substantial assets, location of assets outside of the United States and the location of Ionica's books and records is annexed as Exhibit "J" to the Petition and incorporated herein.

12. A schedule of all known actions or proceedings pending or threatened against Ionica or its property is annexed as Exhibit "K" to the Petition and incorporated herein.

13. A schedule of Ionica's senior management as at the date of this Petition and a brief description of their tenure and relevant responsibilities is annexed as Exhibit "L" to the Petition and incorporated herein. As of the date of the chapter 11 petition, all directors of Ionica have resigned.

B. <u>Cash Flow</u>

14. Annexed as Exhibit "M" to the Petition and incorporated herein is the estimated cashflow of the Debtor during the first 3 months of the administration on a going concern basis (including (x) the estimated payroll for Ionica's employees; (y) estimated cash receipts and cash disbursements and the estimated operating gain or loss, each for or during the thirty (30) day period following the filing of the Petition). This cashflow was prepared by the Debtor and its advisers for the purposes of obtaining the Administration Order. In addition, I understand that no monies will be paid as compensation by Ionica to its officers, stockholders and directors, although they may have claims against the Debtor.

C. Ionica's Subsidiary Ownership Structure

15. Ionica owns directly 100% of the voting securities of those entities set forth in the Securities and Exchange Commission information sheet annexed as Exhibit "A" to the Petition and incorporated herein.

## II. DISCUSSION

A. Description of the Business

16. Ionica is a provider of fixed telephony services for residential and small business customers, using a fixed radio access ("FRA") network. As of October 29, 1998 it had more than 60,000 customers, the majority of whom are residential customers who rely on Ionica for their telephone services, including their emergency telephone services. I understand that Ionica's objective was to become a principal national alternative provider of such fixed telephony services through the United Kingdom (excluding Scotland) (the "Market"). Ionica was founded in 1991 and was granted a public telecommunications operating license by the Department of Trade and Industry ("DTI") on February 9, 1993 ("PTO License"). Ionica utilized FRA technology to provide high-quality telephone services directly to customers. Until mid-1996, Ionica was engaged primarily in start-up and development activities during which time it developed the FRA equipment with Nortel plc ("Nortel") and others.

17. Ionica offered services to residential customers and to some small business customers using its residential service system ("RSS"). The RSS differed from "normal" telephony services in that the link between the customer's premises and the rest of the network was effected by radio waves rather than by cables. The FRA system enabled Ionica to offer telephony services that were comparable to the range and quality of services delivered over fixed wire networks. The FRA system connected existing customer premises equipment (such as telephone handsets, faxes and modems) via the RSS to area base stations and thereafter to Ionica switches to form a collection of regional networks which were then connected to the network of British Telecommunications plc and other telecommunication carriers.

18. Ionica's original plan was to build its network nationally on a region by region basis (the "Phased Roll Out") designed to provide telephone service to over 80% of the population in the Market by March 31, 2002. The PTO License required Ionica to provide coverage to at least 75% of the population in the UK by February 2000. As of September 30, 1998 I understand the network had coverage of approximately 13% of the Market.

19. By September 30, 1998, Ionica had recruited a total of 60,429 customers comprising 27,972 customers in East Anglia, 23,531 customers in the Midlands and 8,926 customers in Yorkshire.

20. Ionica conducted a number of private equity offerings between 1991 and 1997. Together with the proceeds of other offerings (which included two separate US bond offerings, one of $150,000,000 13 1/2% Senior Notes due 2006 issued pursuant to an indenture dated as of August 6, 1996 ("Senior Notes") and one of $200,289,600 15% Senior Discount Notes due 2007 issued pursuant to an indenture dated as of March 15, 1997 ("Senior Discount Notes" and together with the Senior Notes, the "Notes") and secured bank financing, Ionica had prior to its equity offering in July 1997 raised approximately $350,289,600 and £25 million by way of debt and approximately £220 million by way of equity (excluding undrawn facilities available to it). As of mid-June 1997 Ionica had over 300 shareholders.

21. On June 23, 1997, Ionica Group plc ("Group") concluded a share offer pursuant to a corporate reorganization whereby it acquired the entire issued share capital of Ionica in exchange for the allotment to the then shareholders of Ionica of an equal number of ordinary shares in Group. I understand that the principal purpose of the corporate reorganization was to put in place a holding company, Group, which would be able to grant security over its shares in Ionica to the lenders under Ionica's then existing secured bank facility and to any future provider of finance.

22. On July 17, 1997 Ionica (as principal obligor with Group as guarantor of Ionica's obligations) conditionally secured a revolving credit facility (the "RCF") of £300 million from a syndicate including Société Generale, as agent, to fund the costs of continuing to build the

network and operating losses.  In addition on July 25, 1997, Group consummated an initial public offering ("IPO") of 40,000,000 ordinary shares, nominal value 10 pence per share, in the capital of Group.  Group received net proceeds from the IPO of approximately £147 million for the purpose of funding the Phased Roll Out of the network.  I understand that it was intended that funds be drawn down under the RCF after the proceeds of the IPO were exhausted.  The shares of Group are listed on the London Stock Exchange with American Depositary Receipts being listed on NASDAQ.  To my knowledge, both the Senior Discount Notes and the Senior Notes are listed on the London Stock Exchange and NASDAQ, although I understand that trading has been suspended.

23. On November 19, 1997, I understand that Group announced to the London Stock Exchange and NASDAQ and in presentations to analysts that the number of customers connected to the service was below that projected at the time of the IPO due to delays in both the Phased Roll Out of the network and the implementation of capacity enhancing software. Together, these caused constraints in customer recruitment.  The deployment of the software upgrades which was needed to remove those constraints were at the time of the IPO scheduled to begin in September, 1997 but did not actually begin until April 1998.  The RCF included, inter alia, requirements to achieve certain minimum customer numbers.  As a consequence of the above delays and constraints, I understand that Ionica and Group were unable to satisfy certain covenants under the RCF, including those as to minimum customer numbers.  Without renegotiation of the conditions to draw down the RCF, Ionica could not access the monies under the RCF.

B. Loans From Group to Ionica

24. Ionica's principal source of financing from June 1997 onwards was the funds which had been raised by Group pursuant to the IPO.  Ionica was dependent upon continued funding by Group because the only cash within the Ionica group of companies was held by Group.  At the time of the IPO, Group had not downstreamed to Ionica all of the proceeds of the IPO.  From time to time, Group reconsidered whether or not it was in the best interests of

Group to contunue to advance funds to Ionica. I understand the funds were advanced to Ionica from time to time by Group to enable Ionica to meet its operating and other expenditures as and when required as follows: until March 25, 1998, funds were advanced by way of loan and then capitalized. After March 25, 1998, no further loans were capitalized and funds were lent by Group to Ionica until August 6, 1998 on an unsecured basis. From August 11, 1998 to September 25, 1998 loans were made on a secured basis. Thereafter, once a memorandum of understanding was signed with a strategic investor, and the transaction contemplated thereby had been approved in principle by the informal Noteholders' committee (as discussed below), Group agreed to lend once again on an unsecured basis (which it did in respect of loans made on and after September 25, 1998 until October 23, 1998) as it was considered likely that a deal would be concluded. On October 26, 1998 Group advanced further funding to Ionica on a secured basis.

C.  Events Leading to Chapter 11

25. By May 22, 1998, it was clear that neither Ionica nor Group would be able to renegotiate the terms of the RCF so as to enable that facility to be capable of draw down before meeting certain pre-conditions including the injection of new equity funds and the continued reduction of operating costs.

26. Between May 22, 1998 and July 31, 1998, Ionica and Group commenced a search for a strategic investor. I understand that the directors of Group and Group envisaged that the search would secure a long term investor for the benefit of both Group and Ionica. While the search continued, Ionica further cut its revenue expenditure and customer recruitment. A target list of potential strategic investors prepared by Warburg Dillion Read. Such list was reviewed and a date at the end of July was set as an initial deadline by which the search for an investor should be concluded. On May 27, 1998 Group instructed the corporate recovery team of PricewaterhouseCoopers to assist in preparing a new strategic business plan with the intention of providing an improved basis for discussions with investors. This new strategic business plan incorporated a number of measures including a review of possible alternative sources of hardware

supply and a reduced cost base. Group, Ionica and PricewaterhouseCoopers also began contingency planning for an insolvency proceeding with respect to Ionica.

27. An announcement was made to the London Stock Exchange and NASDAQ on May 22, 1998 to the effect that Ionica had not agreed to conditions with its banking syndicate to enable it to draw down under the RCF. The announcement also stated that, in light of an increased funding requirement which had resulted from operational difficulties, Ionica had been advised that it should seek further equity funding before pursuing debt financing and that, accordingly, Group had instructed its financial advisers to find a strategic investor.

28. During June and July 1998, the search for a strategic investor continued. Warburg Dillon Read contacted 118 potential investors, and 36 parties signed confidentiality letters which enabled them to enter into more detailed discussions with Ionica.

29. On August 3, 1998, Group announced to the London Stock Exchange and NASDAQ that Group had, to date, been unable to attract a strategic investor but that it had instructed its financial adviser, Warburg Dillon Read, to continue the search. It also stated that any funding from a strategic investor might be conditional upon a restructuring of the outstanding bonds of Ionica and that accordingly BT Alex Brown had been appointed to open discussions with the Noteholders as to the terms of any such restructuring.

30. A further announcement was made to the London Stock Exchange and to NASDAQ on August 11th, that Group had agreed to use the remaining proceeds of its IPO to provide further short-term funding to Ionica on a secured basis. As discussed above, funds of £11 million were lent to Ionica from Group on a secured basis from August 11th to September 10th, thereafter £11.5 million was lent unsecured until October 26th whereupon a further £2.7 million was lent on a secured basis.

31. In the period since the end of July, a revised business plan was produced and indications of support were received from the Noteholders (through the informal Noteholders committee). A possible strategic investor was identified and detailed negotiations were commenced. A memorandum of understanding with a potential strategic investor was signed on

September 18, 1998. Attached to the memorandum was a timetable indicating that an announcement should be made on October 16, 1998. Approximately one week before that date, the possible strategic investor informed Group and Ionica that it needed a further month in which to complete its due diligence and to put in place the financing it needed. On October 23, 1998, Group and Ionica held its annual general meeting of its shareholders and on the following day there was press coverage (which the directors of Group and Ionica believe was inaccurate and speculative) which led to a rise in the price of Group's shares.

32. On the morning of Monday, October 26, 1998, the Group shares listed on the London Stock Exchange began trading in volumes and at a price which was of concern to Ionica, Group and Warburg Dillon Read. On Warburg Dillon Read's recommendation, Ionica applied for, and was granted, a temporary suspension of its shares and Senior Notes on the basis that a false market might exist in Group's shares and those Senior Notes. During the course of the day a similar suspension was granted in respect of Ionica's American Depositary Receipts listed on NASDAQ.

33. Over the next day or so, Ionica, Group and Warburg Dillion Read made strenuous efforts to assist the strategic investor but on Tuesday, October 27, 1998 written confirmation was received from the strategic investor that it was unable to reach agreement with Nortel with respect to certain funding and supply issues and would therefore have to withdraw from its intent to make an offer in respect of Ionica and Group. This was reconfirmed on October 28, 1998.

34. The board of Ionica convened on October 29th to consider its position and determine whether it could continue to trade. The board of Group informed Ionica that no further funding would be available. On October 29, 1998 I understand that Ionica had cash at bank of £1.8 million, income for the period from September 14, 1998 to October 11, 1998 (being the latest date to which management accounts are available) of £1,128,000 and operating expenditure for the same period of £8,254,000.

D.   The UK Administration Proceeding

35.   This confluence of events led Ionica to consider a number of alternatives including an out-of court restructuring.  During the past three months, I understand that Ionica has diligently and actively pursued these activities. Having considered the circumstances and alternatives with which Ionica was faced, namely that no strategic investor had been identified in respect of which the Board were sufficiently satisfied that an investment was reasonably likely to be consumed (despite the exhaustive search that had been conducted) within the available time frame, the Board of Ionica resolved on October 29, 1998 that a petition should be presented to the High Court for the administration of Ionica, specifically to achieve the purpose of a more advantageous realization of assets than would be effected on a winding-up.  Pursuant to the Administration Order, the High Court appointed three Joint Administrators: Christopher John Hughes and Neville Barry Kahn, from PricewaterhouseCoopers, and myself.

36.   Following the appointment of the Joint Administrators, discussions ensued with potential interested parties for the purchase of all or part of the business and assets of the Debtor.  As of the date of this Petition, no firm conclusion has been reached as to whether or not the business can be sold as a going concern.  In the interim, a number of employees and senior management have been terminated in order to reduce costs.  The assets, books and records of the Debtor have been identified and secured by the Joint Administrators.

37.   Pursuant to a memorandum of understanding, dated October 29, 1998 (the "Memorandum"), between Ionica, myself and the PWC Administrators, it was agreed that I would be responsible for the investigation of the business of Ionica for the purpose of establishing all and any claims as might be maintainable by Ionica in relation to Ionica's trading during any period prior to the Administration Order, whether against the directors of Ionica, its financial, legal and/or other advisors or any other person or corporate entity whatsoever and wheresoever situated.  I retain the sole discretion to undertake and pursue an investigation and the initiation, continuance, settlement or compromise of any legal action or other proceeding (whether such

proceeding is commenced in the UK or a foreign jurisdiction). A copy of the Memorandum is annexed hereto as Exhibit "2" to this Affidavit.

38. The High Court appointed the Joint Administrators to, among other things, maximize value to Ionica's creditors. Because the overwhelming majority of Ionica's Creditors are located in the US along with certain valuable assets, I have determined to commence this chapter 11 proceeding to stabilize the Debtor's business under the protection of chapter 11 of the Bankruptcy Code and investigate and prosecute any and all meritorious claims. I believe this course of action is in the interests of the general body of Ionica's creditors, to whom I owe my duties. The PWC Administrators consent to this course of action and together we have sought and obtained a direction from the High Court of England and Wales to proceed with this chapter 11 proceeding. A copy of the High Court's order is attached as Exhibit "3" to this Affidavit.

## III. CONCLUSION

39. The Debtor hopes to confirm a plan of reorganization and emerge from chapter 11 in as short a time as is necessary. The Debtor believes that the protections afforded by chapter 11 will enable it to develop, implement and consummate a financial restructuring that will provide for the equitable treatment of all claims and interests and maximize and preserve the value of Ionica's assets for the benefit generally of its creditors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December __, 1998

_____
GARETH HOWARD HUGHES